(Slip Opinion) OCTOBER TERM, 2004 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BELL, WARDEN *v.* THOMPSON

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 04–514.  Argued April 26, 2005—Decided June 27, 2005

After respondent Thompson was convicted of murder and sentenced to death, Tennessee state courts denied postconviction relief on his claim that his trial counsel had been ineffective for failing to adequately investigate his mental health.  His federal habeas attorneys subsequently retained psychologist Dr. Sultan, whose report and deposition contended that Thompson suffered from serious mental illness at the time of his offense.  The District Court dismissed the petition, but apparently Thompson's habeas counsel had failed to include Sultan's deposition and report in the record.  Upholding the dismissal, the Sixth Circuit, *inter alia,* found no ineffective assistance and did not discuss Sultan's report and deposition in detail.  That court later denied rehearing, but stayed issuance of its mandate pending disposition of Thompson's certiorari petition.  After this Court denied certiorari on December 1, 2003, the Sixth Circuit stayed its mandate again, pending disposition of a petition for rehearing, which this Court denied on January 20, 2004.  A copy of that order was filed with the Sixth Circuit on January 23, but the court did not issue its mandate.  The State set Thompson's execution date, and state and federal proceedings began on his competency to be executed.  Competency proceedings were pending in the Federal District Court on June 23, 2004, when the Sixth Circuit issued an amended opinion in the federal habeas case, vacating the District Court's habeas judgment and remanding the case for an evidentiary hearing on the ineffective-assistance claim.  The Sixth Circuit supplemented the record on appeal with Sultan's deposition and explained that its authority to issue an amended opinion five months after this Court denied rehearing was based on its inherent power to reconsider an opinion before issuance of the mandate.

*Held:* Assuming that Federal Rule of Appellate Procedure 41 authorizes
a stay of a mandate following a denial of certiorari and that a court
may stay the mandate without entering an order, the Sixth Circuit's
decision to do so here was an abuse of discretion. Pp. 6–19.

  (a) This Court need not decide the scope of the court of appeals'
Rule 41 authority to withhold a mandate in order to resolve this case.
Pp. 6–9.

  (b) Prominent among the reasons warranting the result here is
that the Sixth Circuit did not release its amended opinion for more
than five months after this Court denied rehearing. The consequence
of delay for the State's criminal justice system was compounded by
the Sixth Circuit's failure to issue an order or otherwise give notice to
the parties that it was reconsidering its earlier opinion. The express
terms of the Sixth Circuit's stay state that the mandate would be
stayed until this Court acted on the rehearing petition. Thus, once
rehearing was denied, the stay dissolved by operation of law. Ten-
nessee, relying on the Sixth Circuit's earlier orders and this Court's
certiorari and rehearing denials could assume that the mandate
would issue, especially since Thompson sought no additional stay and
the Sixth Circuit gave no indication that it might be revisting its ear-
lier decision. The latter point is important, for it is an open question
whether a court may exercise its Rule 41(b) authority to extend the
time to issue a mandate through mere inaction. Without a formal
docket entry neither the parties nor this Court had, or have, any way
to know whether the Sixth Circuit had stayed the mandate or simply
made a clerical mistake. That court could have spared the parties
and state judicial system considerable time and resources had it noti-
fied them that it was reviewing its decision. The scheduling of
Thompson's execution and the resulting competency proceedings
were steps taken in reliance on the assumption that the federal ha-
beas case was final. That assumption was all the more reasonable
because the delay in issuing the mandate took place after this Court
had denied certiorari, which usually signals the end of litigation. See
Fed. Rule App. Proc. 41(d)(2)(D). The fact that the Sixth Circuit had
the opportunity at the rehearing stage to consider the same argu-
ments it eventually adopted in its amended opinion is yet another
factor supporting the determination here. A review of the Sultan
deposition also reinforces this conclusion. While the evidence would
have been relevant to the District Court's analysis, it is not of such a
character as to warrant the Sixth Circuit's extraordinary departure
from standard procedures. Finally, by withholding its mandate for
months—based on evidence supporting only an arguable constitu-
tional claim—while the State prepared to carry out Thompson's sen-
tence, the Sixth Circuit did not accord the appropriate level of respect

Syllabus

to the State's judgment that Thompson's crimes merit the ultimate punishment. See *Calderon* v. *Thompson*, 523 U. S. 538, 554–557. Pp. 9–19.

373 F. 3d 688, reversed.

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and THOMAS, JJ., joined. BREYER, J., filed a dissenting opinion, in which STEVENS, SOUTER, and GINSBURG, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 04–514

RICKY BELL, WARDEN, PETITIONER *v.* GREGORY THOMPSON

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 27, 2005]

JUSTICE KENNEDY delivered the opinion of the Court.

This case requires us to consider whether, after we had denied certiorari and a petition for rehearing, the Court of Appeals had the power to withhold its mandate for more than five months without entering a formal order. We hold that, even assuming a court may withhold its mandate after the denial of certiorari in some cases, the Court of Appeals' decision to do so here was an abuse of discretion.

I

In 1985, Gregory Thompson and Joanna McNamara abducted Brenda Blanton Lane from a store parking lot in Shelbyville, Tennessee. After forcing Lane to drive them to a remote location, Thompson stabbed her to death. Thompson offered no evidence during the guilt phase of trial and was convicted by a jury of first-degree murder.

Thompson's defense attorneys concentrated their efforts on persuading the sentencing jury that Thompson's positive qualities and capacity to adjust to prison life provided good reasons for not imposing the death penalty. Before trial, Thompson's counsel had explored the issue of his

mental condition. The trial judge referred Thompson to a state-run mental health facility for a 30-day evaluation. The resulting report indicated that Thompson was competent at the time of the offense and at the time of the examination. The defense team retained their own expert, Dr. George Copple, a clinical psychologist. At sentencing Copple testified that Thompson was remorseful and still had the ability to work and contribute while in prison. Thompson presented the character testimony of a number of witnesses, including former high school teachers, his grandparents, and two siblings. Arlene Cajulao, Thompson's girlfriend while he was stationed with the Navy in Hawaii, also testified on his behalf. She claimed that Thompson's behavior became erratic after he suffered head injuries during an attack by three of his fellow servicemen. In rebuttal the State called Dr. Glenn Watson, a clinical psychologist who led the pretrial evaluation of Thompson's competence. Watson testified that his examination of Thompson revealed no significant mental illness.

The jury sentenced Thompson to death. His conviction and sentence were affirmed on direct review. *State* v. *Thompson*, 768 S. W. 2d 239 (Tenn. 1989), cert. denied, 497 U. S. 1031 (1990).

In his state postconviction petition, Thompson claimed his trial counsel had been ineffective for failing to conduct an adequate investigation into his mental health. Thompson argued that his earlier head injuries had diminished his mental capacity and that evidence of his condition should have been presented as mitigating evidence during the penalty phase of trial. Under Tennessee law, mental illness that impairs a defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law is a mitigating factor in capital sentencing. Tenn. Code Ann. §39–2–203(j)(8) (1982) (repealed); §39–13–204(j)(8) (Lexis 2003). The postconviction court denied relief following an evidentiary hearing, and

the Tennessee Court of Criminal Appeals affirmed. *Thompson* v. *State*, 958 S. W. 2d 156 (1997). The Tennessee Supreme Court denied discretionary review.

Thompson renewed his ineffective-assistance-of-counsel claim on federal habeas. Thompson's attorneys retained a psychologist, Dr. Faye Sultan, to assist with the proceedings. At this point, 13 years had passed since Thompson's conviction. Sultan examined and interviewed Thompson three times, questioned his family members, and conducted an extensive review of his legal, military, medical, and prison records, App. 12, before diagnosing him as suffering from schizoaffective disorder, bipolar type, *id.,* at 20. She contended that Thompson's symptoms indicated he was "suffering serious mental illness at the time of the 1985 offense for which he has been convicted and sentenced. This mental illness would have substantially impaired Mr. Thompson's ability to conform his conduct to the requirements of the law." *Ibid.* Sultan prepared an expert report on Thompson's behalf and was also deposed by the State.

In February 2000, the United States District Court for the Eastern District of Tennessee granted the State's motion for summary judgment and dismissed the habeas petition. The court held that Thompson failed to show that the state court's resolution of his claim rested on an unreasonable application of Supreme Court precedent or on an unreasonable determination of the facts in light of the evidence presented in state court. See 28 U. S. C. §2254(d). The District Court also stated that Thompson had not presented "any significant probative evidence that [he] was suffering from a significant mental disease that should have been presented to the jury during the punishment phase as mitigation." No. 4:98–CV006 (ED Tenn., Feb. 17, 2000), App. to Pet. for Cert. 270. Sultan's deposition and report, however, had apparently not been included in the District Court record.

While Thompson's appeal to the Court of Appeals for the

Sixth Circuit was pending, he filed a motion in the District Court under Federal Rule of Civil Procedure 60(b) requesting that the court supplement the record with Sultan's expert report and deposition. Thompson's habeas counsel at the time explained that the failure to include the Sultan evidence in the summary judgment record was an oversight. Thompson also asked the Court of Appeals to hold his case in abeyance pending a ruling from the District Court and attached the Sultan evidence in support of his motion.

The District Court denied the Rule 60(b) motion as untimely, and the Court of Appeals denied Thompson's motion to hold his appeal in abeyance. On January 9, 2003, a divided panel of the Court of Appeals affirmed the District Court's denial of habeas relief. 315 F. 3d 566. The lead opinion, authored by Judge Suhrheinrich, reasoned that there was no ineffective assistance of counsel because Thompson's attorneys were aware of his head injuries and made appropriate inquiries into his mental fitness. *Id.,* at 589–592. In particular, Thompson's attorneys had requested that the trial court order a competency evaluation. A team of experts at the Middle Tennessee Mental Health Institute, a state-run facility, found "no mental illness, mental defect, or insanity." *Id.,* at 589. Dr. George Copple, the clinical psychologist retained by Thompson's attorneys, also "found no evidence of mental illness." *Ibid.* Judge Suhrheinrich emphasized that none of the experts retained by Thompson since trial had offered an opinion on his mental condition at the time of the crime. *Id.,* at 589–592. The lead opinion contained a passing reference to Thompson's unsuccessful Rule 60(b) motion, but did not discuss the Sultan deposition or expert report in any detail. *Id.,* at 583, n. 13. Judge Moore concurred in the result based on Thompson's failure to present "evidence that his counsel knew or should have known either that Thompson was mentally ill or that his

mental condition was deteriorating at the time of his trial or at the time of his crime." *Id.,* at 595.

Thompson filed a petition for rehearing. The petition placed substantial emphasis on the Sultan evidence, quoting from both her deposition and expert report. The Court of Appeals denied the petition for rehearing and stayed the issuance of its mandate pending the disposition of Thompson's petition for certiorari.

This Court denied certiorari on December 1, 2003. 540 U. S. 1051. The following day, Thompson filed a motion in the Court of Appeals seeking to extend the stay of mandate pending disposition of his petition for rehearing in this Court. The Court of Appeals granted the motion and "ordered that the mandate be stayed to allow appellant time to file a petition for rehearing from the denial of the writ of certiorari, and thereafter until the Supreme Court disposes of the case." App. to Pet. for Cert. 348. On January 20, 2004, this Court denied Thompson's petition for rehearing. 540 U. S. 1158. A copy of the order was filed with the Court of Appeals on January 23, 2004. The Court of Appeals, however, did not issue its mandate.

The State, under the apparent assumption that the federal habeas corpus proceedings had terminated, filed a motion before the Tennessee Supreme Court requesting that an execution date be set. The court scheduled Thompson's execution for August 19, 2004.

From February to June 2004, there were proceedings in both state and federal courts related to Thompson's present competency to be executed under *Ford* v. *Wainwright*, 477 U. S. 399 (1986). The state courts, after considering Sultan's testimony (which was based in part on followup observations after her initial 1998 examination) as well as that of other experts, found Thompson competent to be executed. *Thompson* v. *State*, 134 S. W. 3d 168 (Tenn. 2004). Thompson's *Ford* claim was still pending before the Federal District Court when on June 23, 2004, some seven

months after this Court denied certiorari, the Court of
Appeals for the Sixth Circuit issued an amended opinion
in Thompson's initial federal habeas case. 373 F. 3d 688.
The new decision vacated the District Court's judgment
denying habeas relief and remanded the case for an evi-
dentiary hearing on Thompson's ineffective-assistance-of-
counsel claim. *Id.,* at 691–692. The Court of Appeals
relied on its equitable powers to supplement the record on
appeal with Dr. Sultan's 1999 deposition after finding that
it was "apparently negligently omitted" and "probative of
Thompson's mental state at the time of the crime." *Id.,* at
691. The court also explained its authority to issue an
amended opinion five months after this Court denied a
petition for rehearing: "[W]e rely on our inherent power to
reconsider our opinion prior to the issuance of the man-
date, which has not yet issued in this case." *Id.,* at 691–
692. Judge Suhrheinrich authored a lengthy separate
opinion concurring in part and dissenting in part, which
explained that his chambers initiated the *sua sponte*
reconsideration of the case. He agreed with the majority
about the probative value of the Sultan deposition, refer-
ring to the evidence as "critical." *Id.,* at 733. Unlike the
majority, however, Judge Suhrheinrich would have relied
upon fraud on the court to justify the decision to expand
the record and issue an amended opinion. *Id.,* at 725–726,
729–742. He found "implausible" the explanation offered
by Thompson's habeas counsel for his failure to include
the Sultan deposition in the District Court record, *id.,* at
742, and speculated that counsel "planned to unveil Dr.
Sultan's opinion on the eve of Thompson's execution," *id.*,
at 738, n. 21.

We granted certiorari. 543 U. S. ___ (2005).

## II

At issue in this case is the scope of the Court of Appeals'
authority to withhold the mandate pursuant to Federal

Rule of Appellate Procedure 41. As relevant, the Rule provides:

"(b) When Issued. The court's mandate must issue 7 calendar days after the time to file a petition for rehearing expires, or 7 calendar days after entry of an order denying a timely petition for panel rehearing, petition for rehearing en banc, or motion for stay of mandate, whichever is later. The court may shorten or extend the time.

"(c) Effective Date. The mandate is effective when issued.

"(d) Staying the Mandate.

"(1) On Petition for Rehearing or Motion. The timely filing of a petition for panel rehearing, petition for rehearing en banc, or motion for stay of mandate, stays the mandate until disposition of the petition or motion, unless the court orders otherwise.

"(2) Pending Petition for Certiorari.

"(A) A party may move to stay the mandate pending the filing of a petition for a writ of certiorari in the Supreme Court. The motion must be served on all parties and must show that the certiorari petition would present a substantial question and that there is good cause for a stay.

"(B) The stay must not exceed 90 days, unless the period is extended for good cause or unless the party who obtained the stay files a petition for the writ and so notifies the circuit clerk in writing within the period of the stay. In that case, the stay continues until the Supreme Court's final disposition.

.          .          .          .          .

"(D) The court of appeals must issue the mandate immediately when a copy of a Supreme Court order denying the petition for writ of certiorari is filed."

Tennessee argues that the Court of Appeals was re-

quired to issue the mandate following this Court's denial of Thompson's petition for certiorari. The State's position rests on Rule 41(d)(2)(D), which states that "[t]he court of appeals must issue the mandate immediately when a copy of a Supreme Court order denying the petition for writ of certiorari is filed." This provision, the State points out, admits of no exceptions, so the mandate should have issued on the date that a copy of this Court's order denying certiorari was filed with the Court of Appeals, *i.e.,* December 8, 2003.

The State further contends that because the mandate should have issued in December 2003, the Court of Appeals' amended opinion was in essence a recall of the mandate. If this view is correct, the Court of Appeals' decision to revisit its earlier opinion must satisfy the standard established by *Calderon* v. *Thompson,* 523 U. S. 538 (1998). *Calderon* held that "where a federal court of appeals *sua sponte* recalls its mandate to revisit the merits of an earlier decision denying habeas corpus relief to a state prisoner, the court abuses its discretion unless it acts to avoid a miscarriage of justice as defined by our habeas corpus jurisprudence." *Id.,* at 558. See also *Schlup* v. *Delo,* 513 U. S. 298 (1995); *Sawyer* v. *Whitley,* 505 U. S. 333 (1992).

Thompson counters by arguing that Rule 41(d)(2)(D) is determinative only when the court of appeals enters a stay of the mandate to allow the Supreme Court to dispose of a petition for certiorari. The provision, Thompson says, does not affect the court of appeals' broad discretion to enter a stay for other reasons. He relies on Rule 41(b), which provides the court of appeals may "shorten or extend the time" in which to issue the mandate. Because the authority vested by Rule 41(b) is not limited to the period before a petition for certiorari is denied, he argues that the Court of Appeals had the authority to stay its mandate following this Court's denial of certiorari and rehearing. Although

the Court of Appeals failed to issue an order staying the mandate after we denied rehearing, Thompson asserts that the court exercised its Rule 41(b) powers by simply failing to issue it.

To resolve this case, we need not adopt either party's interpretation of Rule 41. Instead, we hold that— assuming, *arguendo,* both that the Rule authorizes a stay of the mandate following the denial of certiorari and also that a court may stay the mandate without entering an order—here the Court of Appeals abused its discretion in doing so.

## III

We find an abuse of discretion for the following reasons.

Prominent among our concerns is the length of time between this Court's denial of certiorari and the Court of Appeals' issuance of its amended opinion. We denied Thompson's petition for certiorari in December 2003 and his petition for rehearing one month later. From this last denial, however, the Court of Appeals delayed issuing its mandate for over five months, releasing its amended opinion in June.

The consequence of delay for the State's criminal justice system was compounded by the Court of Appeals' failure to issue an order or otherwise give notice to the parties that the court was reconsidering its earlier opinion. The Court of Appeals had issued two earlier orders staying its mandate. The first order stayed the mandate pending disposition of Thompson's petition for certiorari. The second order extended the stay to allow Thompson time to file a petition for rehearing with this Court and "thereafter until the Supreme Court disposes of the case." So by the express terms of the second order the mandate was not to be stayed after this Court acted; and when we denied rehearing on January 20, 2004, the Court of Appeals' second stay dissolved by operation of law. Tennessee,

acting in reliance on the Court of Appeals' earlier orders and our denial of certiorari and rehearing, could assume that the mandate would—indeed must—issue. While it might have been prudent for the State to verify that the mandate had issued, it is understandable that it proceeded to schedule an execution date. Thompson, after all, had not sought an additional stay of the mandate, and the Court of Appeals had given no indication that it might be revisiting its earlier decision.

This latter point is important. It is an open question whether a court may exercise its Rule 41(b) authority to extend the time for the mandate to issue through mere inaction. Even assuming, however, that a court could effect a stay for a short period of time by withholding the mandate, a delay of five months is different in kind. "Basic to the operation of the judicial system is the principle that a court speaks through its judgments and orders." *Murdaugh Volkswagen, Inc.* v. *First National Bank of South Carolina*, 741 F. 2d 41, 44 (CA4 1984). Without a formal docket entry neither the parties nor this Court had, or have, any way to know whether the court had stayed the mandate or simply made a clerical mistake. Cf. *Ballard* v. *Commissioner*, 544 U. S. ___, ___ (2005) (slip op., at 17). The dissent claims "the failure to notify the parties was likely due to a simple clerical error" on the part of the Clerk's office. *Post,* at 12–13 (opinion of BREYER, J.). The record lends no support to this speculation. The dissent also fails to explain why it is willing to apply a "presumption of regularity" to the panel's actions but not to the Clerk's. *Ibid.*

The Court of Appeals could have spared the parties and the state judicial system considerable time and resources if it had notified them that it was reviewing its original panel decision. After we denied Thompson's petition for rehearing, Tennessee scheduled his execution date. This, in turn, led to various proceedings in state and federal

court to determine Thompson's present competency to be executed. See, *e.g., Thompson* v. *State*, 134 S. W. 3d 168 (Tenn. 2004). All of these steps were taken in reliance on the mistaken impression that Thompson's first federal habeas case was final. The State had begun to "invok[e] its entire legal and moral authority in support of executing its judgment." *Calderon* v. *Thompson,* 523 U. S., at 556–557.

The parties' assumption that Thompson's habeas proceedings were complete was all the more reasonable because the Court of Appeals' delay in issuing its mandate took place after we had denied certiorari. As a practical matter, a decision by this Court denying discretionary review usually signals the end of litigation. While Rule 41(b) may authorize a court to stay the mandate after certiorari is denied, the circumstances where such a stay would be warranted are rare. See, *e.g.*, *First Gibraltar Bank, FSB* v. *Morales*, 42 F. 3d 895 (CA5 1995); *Alphin* v. *Henson*, 552 F. 2d 1033 (CA4 1977). In the typical case, where the stay of mandate is entered solely to allow this Court time to consider a petition for certiorari, Rule 41(d)(2)(D) provides the default: "The court of appeals must issue the mandate immediately when a copy of a Supreme Court order denying the petition for writ of certiorari is filed."

By providing a mechanism for correcting errors in the courts of appeals before Supreme Court review is requested, the Federal Rules of Appellate Procedure ensure that litigation following the denial of certiorari will be infrequent. See Fed. Rule App. Proc. 40(a) ("Unless the time is shortened or extended by order or local rule, a petition for panel rehearing may be filed within 14 days after entry of judgment"). See also Fed. Rules App. Proc. 35 (rehearing en banc), 40 (panel rehearing).

Indeed, in this case Thompson's petition for rehearing and suggestion for rehearing en banc pressed the same

arguments that eventually were adopted by the Court of Appeals in its amended opinion. The Sultan evidence, first presented to the Court of Appeals as an attachment to Thompson's motion to hold his appeal in abeyance, was quoted extensively in the petition for rehearing to the Court of Appeals. Pet. for Rehearing and Suggestion for Rehearing En Banc in No. 2:00–5516 (CA6), pp. 12–20, 28–31. After the request for rehearing was denied, the State could have assumed with good reason that the Court of Appeals was not impressed by Thompson's arguments based on the Sultan evidence. The court's opportunity to consider these arguments at the rehearing stage is yet another factor supporting our determination that the decision to withhold the mandate was in error. Cf. *Calderon* v. *Thompson, supra,* at 551–553 (questioning whether a "mishandled law clerk transition" and the "failure of another judge to notice the action proposed by the original panel" would justify recalling the mandate in a nonhabeas case).

The dissent's explanation of how the Sultan evidence was overlooked is inaccurate in several respects. For example, the statements that the "Sultan documents were not in the initial record on appeal," *post,* at 9, and that "the panel previously had not seen these documents" before the rehearing stage, *id.,* at 9, convey the wrong impression. Although the Sultan evidence was not part of the District Court's summary judgment record, the documents were included in the certified record on appeal as attachments to Thompson's Rule 60(b) motion. Record 133; Docket Entry 4/5/02 in No. 98–CV–6 (ED Tenn.); Docket Entry 4/10/02 in No. 00–5516 (CA6). The dissent also argues the petition for rehearing did not adequately bring the Sultan evidence to the attention of the Court of Appeals. *Post,* at 9–10, 13–14. This is simply untrue. The original panel opinion, which did not discuss the Sultan evidence in any detail, emphasized that Thompson had

failed to produce any evidence that he was mentally ill at the time of his offense. 315 F. 3d, at 590; *id.,* at 595–596 (Moore, J., concurring). The petition for rehearing attacked this conclusion in no uncertain terms and placed the Sultan evidence front and center. Here, for example, is an excerpt from the petition's table of contents:

> "II. THE CONCLUSION THAT THERE IS NO EVIDENCE PRESENTED IN THE RECORD OF THOMPSON'S MENTAL ILLESS AT THE TIME OF THE CRIME IS WRONG
>
> "A. Thompson Has Set Forth Above The Record Facts Demonstrating His Mental Illness At The Time of The Crime
>
> "B. The Majority Overlooks The Facts And Expert Opinion Set Forth In Dr. Sultan's Report and Deposition." Pet. for Rehearing and Suggestion for Rehearing En Banc in No. 2:00–5516 (CA6), p. ii.

See also *id.,* at 1 (mentioning the Sultan evidence in the second paragraph of the statement in support of panel rehearing). The rehearing petition did not explain why Sultan's deposition and expert report had been omitted from the summary judgment record but that is beside the point. The petition acknowledged that the Sultan evidence was first presented to the District Court as an attachment to the Rule 60(b) motion, *id.,* at 29, and gave the Sultan evidence a prominent and explicit mention in the table of contents. It is difficult to see how Thompson's counsel could have been clearer in telling the Court of Appeals that it was wrong. The dissent's treatment of this issue assumes that judges forget even the basic details of a capital case only one month after issuing a 38-page opinion and that judges cannot be relied upon to read past the first page of a petition for rehearing. The problem is that the dissent cannot have it both ways: If the Sultan evidence is as crucial as the dissent claims, it would not

easily have been overlooked by the Court of Appeals at the rehearing stage.

Our review of the Sultan deposition reinforces our conclusion that the Court of Appeals abused its discretion by withholding the mandate. Had the Sultan deposition and report been fully considered in the federal habeas proceedings, it no doubt would have been relevant to the District Court's analysis. Based on the Sultan deposition Thompson could have argued he suffered from mental illness at the time of his crime that would have been a mitigating factor under Tennessee law and that his trial attorneys were constitutionally ineffective for failing to conduct an adequate investigation into his mental health.

Relevant though the Sultan evidence may be, however, it is not of such a character as to warrant the Court of Appeals' extraordinary departure from standard appellate procedures. There are ample grounds to conclude the evidence was unlikely to have altered the District Court's resolution of Thompson's ineffective-assistance-of-counsel claim. Sultan examined Thompson for the first time on August 20, 1998, App. 37, some 13 years after Thompson's crime and conviction. She relied on the deterioration in Thompson's present mental health—something that obviously was not observable at the time of trial—as evidence of his condition in 1985. (Indeed, there was a marked decline in his condition during the 6-month period between Sultan's first two visits. *Id.,* at 51–58.) Sultan's findings regarding Thompson's condition in 1985 are contradicted by the testimony of two experts who examined him at the time of trial, Dr. Watson and Dr. Copple. Watson performed a battery of tests at the Middle Tennessee Mental Health Institute, where Thompson was referred by the trial court for an examination, and concluded that Thompson "'[did] not appear to be suffering from any complicated mental disorder which would impair his capacity to appreciate the wrongfulness of the alleged

offenses, or which would impair his capacity to conform his conduct to the requirements of the law.'" 19 Tr. 164. Indeed, Watson presented substantial evidence supporting his conclusion that Thompson was malingering for mental illness. *Id.,* at 151–152; 20 *id.,* at 153–160. For example, Thompson claimed he could not read despite a B average in high school and one year's college credit. 19 *id.,* at 137; 20 *id.,* at 151. Thompson's test scores also indicated that he was attempting to fake schizophrenia. 20 *id.,* at 153–154. Copple, the psychologist retained by Thompson's defense team, agreed with Watson that Thompson was not suffering from mental illness. 19 *id.,* at 58. Had the Sultan deposition been included in the District Court record, Thompson still would have faced an uphill battle to obtaining federal habeas relief. He would have had to argue that his trial attorneys should have continued to investigate his mental health even after both Watson and Copple had opined that there was nothing to uncover.

Sultan's testimony does not negate Thompson's responsibility for committing the underlying offense, but it does bear upon an argument that Thompson's attorneys could have presented at sentencing. Sultan's ultimate conclusion—that Thompson's mental illness substantially impaired his ability to conform his conduct to the requirements of the law—is couched in the language of a mitigating factor under Tennessee law. Tenn. Code Ann. §39–2–203(j)(8) (1982). See also §39–13–204(j)(8) (Lexis 2003). Thompson's trial attorneys, however, chose not to pursue a mitigation strategy based on mental illness, stressing instead character evidence from family and friends and expert testimony that he had the capacity to adjust to prison. *Thompson* v. *State*, 958 S. W. 2d, at 164–165. This strategic calculation, while ultimately unsuccessful, was based on a reasonable investigation into Thompson's background. Sultan relied on three witnesses in preparing her report: Thompson's grandmother, sister,

and ex-girlfriend. These witnesses not only were interviewed by the defense attorneys; they testified at sentencing. Consultation with these witnesses, when combined with the opinions of Watson and Copple, provided an adequate basis for Thompson's attorneys to conclude that focusing on Thompson's mental health was not the best strategy. As the Tennessee Court of Criminal Appeals noted, "Because two experts did not detect brain damage, counsel cannot be faulted for discarding a strategy that could not be supported by a medical opinion." *Id.,* at 165.

Without a single citation to the record, the dissent suggests that Thompson's attorneys failed to conduct adequate interviews of the defense witnesses on whom Sultan relied in her report. *Post,* at 14–15. Most of the information on Thompson's childhood was provided to Sultan by Nora Jean Wharton, Thompson's older sister. App. 16–18. Setting aside the fact that Thompson did not argue in state court that his counsel's interview of Wharton was inadequate, *Thompson* v. *State*, 958 S. W. 2d, at 160–169, Thompson's attorneys cannot be faulted for failing to elicit from her any details on Thompson's difficult home life. After all, Wharton testified at trial that Thompson's childhood was "poor," but "very happy." 18 Tr. 3. The dissent also implies that the experts who examined Thompson lacked information necessary to reach an accurate assessment. The record refutes this assertion. In conducting his examination, Watson had access to Thompson's social history and military records. 19 *id.,* at 149; 20 *id.,* at 186 (Exh. 102, pp. 11, 27–28). Watson was also aware of the prior head injuries as well as Thompson's claim that he heard voices. 19 *id.,* at 152; 20 *id.,* at 154–155. Nevertheless, Watson, whose evaluation was contemporaneous with the trial, found no evidence that Thompson was mentally ill at the time of the crime. Watson's report was unequivocal on this point:

"'Mr. Thompson's speech and communication were coherent, rational, organized, relevant, and devoid of circumstantiality, tangentiality, looseness of associations, paranoid ideation, ideas of reference, delusions, and other indicators of a thought disorder. His affect was appropriate to his thought content, and he exhibited no flight of ideas, manic, depressed, or bizarre behaviors, and his speech was not pressured nor rapid. He exhibited none of the signs of an affective illness. His judgment and insight are rather poor. Psychological testing revealed him to be functioning in the average range intellectually, to exhibit no signs of organicity or brain damage on the Bender-Gestalt Test and the Bender Interference Procedure. Personality profiles revealed no evidence of a psychosis, but indicated malingering in the mental illness direction. (For example, the schizophrenic score was at T 120, while clinical observations revealed no evidence of a thought disorder.) Mr. Thompson's memory for recent and remote events appeared unimpaired.'" 20 *id.,* at 159–160.

Sultan's testimony provides some support for the argument that the strategy of emphasizing Thompson's positive attributes was a mistake in light of Thompson's deteriorated condition 13 years after the trial. This evidence, however, would not come close to satisfying the miscarriage of justice standard under *Calderon* had the Court of Appeals recalled the mandate. Neither, in our view, did this evidence justify the Court of Appeals' decision to withhold the mandate without notice to the parties, which in turn led the State to proceed for five months on the mistaken assumption that the federal habeas proceedings had terminated. The dissent suggests that failing to take account of the Sultan evidence would result in a "miscarriage of justice," *post,* at 1–2, 16, but the dissent uses that

phrase in a way that is inconsistent with our precedents. In *Sawyer* v. *Whitley,* 505 U. S., at 545–547, this Court held that additional mitigating evidence could not meet the miscarriage of justice standard. Only evidence that affects a defendant's eligibility for the death penalty—which the Sultan evidence is not—can support a miscarriage of justice claim in the capital sentencing context. *Id.,* at 547; *Calderon,* 523 U. S., at 559–560.

One last consideration informs our review of the Court of Appeals' actions. In *Calderon*, we held that federalism concerns, arising from the unique character of federal habeas review of state-court judgments, and the policies embodied in the Antiterrorism and Effective Death Penalty Act of 1996 required an additional presumption against recalling the mandate. This case also arises from federal habeas corpus review of a state conviction. While the State's reliance interest is not as strong in a case where, unlike *Calderon*, the mandate has not issued, the finality and comity concerns that animated *Calderon* are implicated here. Here a dedicated judge discovered what he believed to have been an error, and we are respectful of the Court of Appeals' willingness to correct a decision that it perceived to have been mistaken. A court's discretion under Rule 41 must be exercised, however, in a way that is consistent with the "'State's interest in the finality of convictions that have survived direct review within the state court system.'" *Id.,* at 555 (quoting *Brecht* v. *Abrahamson,* 507 U. S. 619, 635 (1993)). Tennessee expended considerable time and resources in seeking to enforce a capital sentence rendered 20 years ago, a sentence that reflects the judgment of the citizens of Tennessee that Thompson's crimes merit the ultimate punishment. By withholding the mandate for months—based on evidence that supports only an arguable constitutional claim—while the State prepared to carry out Thompson's sentence, the Court of Appeals did not accord the appropriate level of

respect to that judgment. See *Calderon* v. *Thompson, supra,* at 554–557.

The Court of Appeals may have been influenced by Sultan's unsettling account of Thompson's condition during one of her visits. She described Thompson as being in "terrible psychological condition," "physically filthy," and "highly agitated." App. 51. This testimony raised questions about Thompson's deteriorating mental health and perhaps his competence to be executed, but these concerns were properly addressed in separate proceedings. Based on the most recent state-court decision, which rejected the argument that Thompson is not competent to be executed, it appears that his condition has improved. *Thompson* v. *State*, 134 S. W. 3d, at 184–185. Proceedings on this issue were underway in the District Court when the Court of Appeals issued its second opinion. If those proceedings resume, the District Court will have an opportunity to address these matters again and in light of the current evidence.

Taken together these considerations convince us that the Court of Appeals abused any discretion Rule 41 arguably granted it to stay its mandate, without entering a formal order, after this Court had denied certiorari. The judgment of the Court of Appeals for Sixth Circuit is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 04–514

RICKY BELL, WARDEN, PETITIONER *v.* GREGORY THOMPSON

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 27, 2005]

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

This capital case arises out of unusual circumstances—circumstances of a kind that I have not previously experienced in the 25 years I have served on the federal bench. After an appellate court writes and releases an opinion, but before it issues its mandate, the writing judge, through happenstance, comes across a document that (he reasonably believes) shows not only that the court's initial decision is wrong but that the decision will lead to a serious miscarriage of justice. What is the judge to do?

What the judge did here was to spend time—hundreds of hours (while a petition for certiorari was pending before this Court and during the five months following our denial of the petition for rehearing)—reviewing the contents of the vast record with its many affidavits, reports, transcripts, and other documents accumulated in the course of numerous state and federal proceedings during the preceding 20 years. The judge ultimately concluded that his initial instinct about the document was correct. The document was critically important. It could affect the outcome of what is, and has always been, the major issue in the case. To consider the case without reference to it could mean a miscarriage of justice.

The judge consequently wrote a lengthy opinion (almost

30,000 words) explaining what had happened. The other members of the panel did not agree with everything in that opinion, but they did agree that their initial decision must be vacated.

The Court commendably describes what occurred as follows: A "dedicated judge discovered what he believed to have been an error, and we are respectful of the Court of Appeals' willingness to correct a decision that it perceived to have been mistaken." *Ante*, at 18. The Court, however, does not decide this case in a manner consistent with that observation. A somewhat more comprehensive account of the nature of the "error"—of the matter at stake, of the importance of the document, of the mystery of its late appearance, of the potential for a miscarriage of justice— should help make apparent the difficult circumstance the panel believed it faced. It will also explain why there was no "abuse" of discretion in the panel's effort to "correct a decision that it perceived to have been mistaken."

I

Judge Suhrheinrich, the panel member who investigated the record, is an experienced federal judge, serving since 1984 as a federal trial court judge and since 1990 as a federal appellate judge. He wrote a lengthy account of the circumstances present here. To understand this case, one must read that full account and then compare it with the Court's truncated version. I provide a rough summary of the matter based upon my own reading of his opinion. 373 F. 3d 688, 692–742 (CA6 2004).

A

The panel's initial decision, issued on January 9, 2003, focused upon an issue often raised when federal habeas courts review state proceedings in a capital case, namely, the effectiveness of counsel at the original trial. 315 F. 3d 566, 587–594 (CA6 2003). See *Strickland* v. *Washington*,

466 U. S. 668 (1984). In this instance, the federal ineffec-tive-assistance claim was that state trial counsel had not sufficiently investigated the background of the defendant, Gregory Thompson. Thompson claimed that an adequate investigation would have shown, to the satisfaction of testifying experts, that he suffered from episodes of schizophrenia at the time of the crime. The schizophre-nia—though episodic—would have proved a mitigating circumstance at the penalty phase. 373 F. 3d, at 697–698, and n. 4.

Thompson's trial took place in a Tennessee state court, where he was found guilty of murder and sentenced to death. His state-appointed counsel put on no defense at trial. At sentencing, however, counsel sought to show that Thompson was schizophrenic. State forensic psychologists examined Thompson and concluded that Thompson, probably "malingering," did not show genuine and signifi-cant symptoms of schizophrenia at that time and was not mentally ill. A clinical psychologist hired by Thompson's counsel examined Thompson for eight hours and reached approximately the same conclusion: he said that Thomp-son was not *then* mentally ill. *Id.*, at 692, 694–695.

Thompson raised the issue of his mental condition in state postconviction proceedings, which he initiated in 1990. His expert witness, Dr. Gillian Blair, testified (with much supportive material) that Thompson was by that time clearly displaying serious schizophrenic symptoms— voice illusions, attempts at physical self-mutilation, and the like. Indeed, the State conceded that he was under a regime of major antipsychotic medication. But Dr. Blair said that she could not determine whether Thompson had been similarly afflicted (*i.e.*, suffering from episodes of schizophrenia) at the time of the crime without a thorough background investigation—funds for which the state court declined to make available. The state court then ruled in the State's favor. *Id.*, at 694–695.

Thompson filed a habeas petition in Federal District Court about eight months after the state court's denial of postconviction relief became final. As I said above, see *supra*, at 3, he claimed ineffective assistance of counsel. The Federal District Court appointed counsel, an assistant federal public defender. Counsel then obtained the services of two experts, Dr. Barry Crown and Dr. Faye Sultan. Both examined Thompson, and the latter, Dr. Sultan, conducted the more thorough background investigation that Dr. Blair had earlier sought. The State, after deposing Dr. Sultan, moved for summary judgment. 373 F. 3d, at 696, 700–704, 711.

The District Court granted that motion on the ground that "Thompson has not provided this Court with anything other than factually unsupported allegations that he was incompetent at the time he committed the crime," nor "has Thompson provided this Court with any significant probative evidence that [he] was suffering from a significant mental disease that should have been presented to the jury during the punishment phase as mitigation evidence." *Id.*, at 712–713 (quoting District Court's memorandum opinion (emphasis and internal quotation marks omitted)).

Thompson (now with a new public defender as counsel) appealed the District Court's grant of summary judgment in the State's favor. (A little over a year later, while the appeal was still pending, Thompson's new counsel, apparently having discovered that Dr. Sultan's deposition and report had not been included in the record before the District Court, filed a motion in that court for relief from judgment under Federal Rule of Civil Procedure 60(b), seeking to supplement the record with those documents. Counsel also filed a motion in the appellate court, with the Sultan deposition attached, requesting that the appeal be held in abeyance while the District Court considered the Rule 60(b) motion. Both motions were denied, and Thompson's counsel did not take an appeal from the Dis-

trict Court's denial of the Rule 60(b) motion.) 373 F. 3d, at 714–715, and n. 10, 724–725.

The Court of Appeals reviewed the District Court's grant of summary judgment. In doing so, the appellate panel examined the record before that court. It noted that Thompson's federal habeas counsel had hired two experts (Crown and Sultan), and had told the court (in an offer of proof) that they would provide evidence that Thompson suffered from mental illness *at the time of the crime*. But the appellate panel found that neither expert had done so. Indeed, said the panel, Thompson had "never submitted to any court *any* proof that he suffered from severe mental illness at the time of the crime." 315 F. 3d, at 590 (emphasis altered). Though Thompson's several attorneys had made the same allegation for many years in several different courts (said the panel), "at each opportunity, counsel fail[ed] to secure an answer to the critical issue of whether Thompson was mentally ill at the time of the crime." *Ibid.* That fact, concluded the panel (over a dissent), was fatal to Thompson's basic ineffective-assistance-of-counsel claim. Obviously "trial counsel cannot be deemed ineffective for failing to discover something that does not appear to exist." *Ibid.;* see also *id.*, at 595 (Moore, J., concurring in result) ("Thompson has presented no evidence that his [trial] counsel knew or should have known either that Thompson was mentally ill or that his mental condition was deteriorating at the time of his trial or at the time of his crime"). The dissenting judge thought Thompson had made out an ineffective-assistance claim by showing that his trial counsel had relied on an inadequate expert, that is, an expert without the necessary qualifications to counter the State's experts' conclusions. *Id.*, at 599–605 (opinion of Clay, J.).

The appeals court issued its opinion on January 9, 2003. Thompson's appointed federal appeals counsel filed a rehearing petition, which the court denied on March 10,

2003.  See App. to Pet. for Cert. 346 (Order in No. 00–5516 (CA6)).  Thompson's counsel then sought Supreme Court review.  This Court denied review (and rehearing) about one year later.  540 U. S. 1051 (2003) (denying certiorari); 540 U. S. 1158 (2004) (denying rehearing).

B

The Court of Appeals, following ordinary appellate-court practice, withheld issuance of its mandate while the case was under review here, namely during calendar year 2003.  During that time and in the months that followed, something unusual happened.  Judge Suhrheinrich realized that the panel, in reaching its decision, seemed to have overlooked documents provided by Dr. Sultan that likely were relevant.  In September 2003, the appellate court called for the entire certified record.  Upon reviewing that record, Judge Suhrheinrich found Dr. Sultan's deposition and accompanying report.  373 F. 3d, at 692–693; App. to Pet. for Cert. 347–348; see also Appendix, *infra.*

The Sultan documents filled the evidentiary gap that underlay the District Court's and the appellate panel's determinations.  These documents made clear that Dr. Sultan had investigated Thompson's background in depth and that in her (well-supported) opinion, Thompson *had* suffered from serious episodic bouts of schizophrenia *at the time the crime was committed.*  Clearly the documents contained evidence supporting Thompson's claim regarding his mental state at the time of the offense.  Why had the District Court denied the existence of *any* such evidence?  Why had Judge Suhrheinrich, and the other members of the panel (and the State, which took Dr. Sultan's deposition) done the same?

Judge Suhrheinrich then drafted an opinion that sought to answer three questions:

Question One: Do these documents actually provide strong evidence that Thompson was schizophrenic (and

seriously so) at the time of the crime?

Question Two: If so, given the many previous opportunities that Thompson has had to raise the issue of his mental health, to what extent would these documents be likely to matter in respect to the legal question raised in Thompson's federal proceedings, *i.e.*, would they likely lead a federal habeas court to hold that Thompson's trial counsel was ineffective for failing to undertake a background investigation akin to that performed by Dr. Sultan?

Question Three: How did these documents previously escape our attention?

1

The panel answered the first question—regarding the importance of the documents—unanimously. Sultan's report and deposition were critically important. As Judge Suhrheinrich's opinion explains, these documents detail Thompson's horrendous childhood, his family history of mental illness, his self-destructive schizophrenic behavior (including auditory hallucinations) as a child, his mood swings and bizarre behavior as a young adult, and a worsening of that behavior after a serious beating to his head that he suffered while in the Navy. For example, Dr. Sultan's examination of Thompson and her interviews with Thompson's family members and others revealed that as a child Thompson would repeatedly bang his head against the wall to "knock the Devil out" after his grandmother yelled at him, "You have the Devil in you." 373 F. 3d, at 716 (internal quotation marks omitted). These documents explain how Thompson, as a young adult, would talk to himself and scream and cry for no apparent reason. They suggest that he had bouts of paranoia.

The documents provide strong support for the conclusion that Thompson suffered from episodes of schizophrenia at the time of the offense. And they thereby offer significant support for the conclusion that, had earlier

testifying experts had this information, they could have countered the State's experts' conclusion that Thompson was malingering at the time of trial. Thus, the Sultan materials seriously undermined the foundation of the State's position in respect to Thompson's mental condition.

The Sultan materials also revealed that trial counsel failed to discover other mitigating evidence of importance. Interviews with family members revealed repeated incidents of violence in the family, including an episode in which, as a young boy, Thompson witnessed his father brutally beat and rape his mother. His grandmother, with whom Thompson and his siblings lived after their mother died, subjected them to abuse and neglect. She would forget to feed the children, leaving them to steal money from under her bed to buy food. These and other circumstances are detailed in sections of the Sultan report and deposition reproduced in the Appendix, *infra.*

2

The panel also responded unanimously and affirmatively to the second question: Would federal-court access to the Sultan documents likely have made a significant difference in respect to the federal legal question at issue in Thompson's habeas petition, namely, the failure of Thompson's trial counsel to investigate his background? Trial counsel had had important indications that something was wrong. Indeed, counsel himself had sought an evaluation of Thompson's mental condition. He also was aware of Thompson's violent behavior in the military, and knew that Thompson had said he had had auditory hallucinations all his life. He was aware, too, of the changes in Thompson's behavior. Should counsel not then have investigated further?

The Sultan documents make clear that, had he done so, he would have had a strong answer to the State's experts. Thus the documents were relevant to the outcome of the

federal habeas proceedings. The Federal District Court based its grant of summary judgment on the premise that there was *no* evidence supporting Thompson's claim. The documents showed that precisely such evidence was then available.

3

The panel (while disagreeing about how to allocate blame) agreed in part about the answer to the third question: how these documents previously had escaped the panel's attention. The judges agreed that the Sultan documents were not in the initial record on appeal. The panel's original opinion, while mentioning both Dr. Sultan and Dr. Crown, assumed that neither expert had addressed Thompson's mental condition at the time of the crime. 315 F. 3d, at 583, n. 13 ("Sultan's affidavit does not discuss Thompson's mental state *at the time of the offense*" (emphasis added)); *ibid.* (explaining that Thompson filed a Rule 60(b) motion to supplement the record with Dr. Sultan's report, but not mentioning that the report addressed Thompson's mental condition at the time of the offense); see also *supra,* at 5.

How had the panel overlooked the copies of the Sultan deposition attached to (1) the rehearing petition and (2) the (Rule 60(b)-related) motion to hold the appeal in abeyance? As for the rehearing petition, the reason could well lie in the petition's (incorrect) suggestion that the panel had already considered the appended document as part of the original record. See Pet. for Rehearing and Suggestion for Rehearing En Banc in No. 2:00–5516 (CA6), p. 1 ("A majority of this panel overlooked other proof in the record, including but not limited to, the expert opinion of Dr. Faye E. Sultan"); see also *id.*, at 28–32. While the petition explains the importance of the documents, it does not explain the circumstances, namely, that the panel previously had not seen these documents. Instead, it gives the

impression that counsel was simply reemphasizing a
matter the panel had already considered. To that extent,
the petition reduced the likelihood that the panel would
make the connection it later made and fatally weakened
its argument for *re*-hearing.

As for the motion to hold the appeal in abeyance, the
panel's failure to recognize the significance of the ap-
pended Sultan materials is also understandable. The
motion gives the impression that the appellate court
would have been able to handle any problem arising from
the exclusion of these materials in an appeal taken from
the District Court's Rule 60(b) decision. The appellate
court, however, never had any such opportunity because
counsel did not appeal the District Court's denial of the
Rule 60(b) motion.

C

Once the panel understood the significance of the Sultan
report, it had to decide what to do. An appellate court
exists to correct legal errors made in the trial court. What
legal error had the District Court committed? The appeal
concerned its grant of summary judgment in the State's
favor. The District Court made that decision on the basis
of the record before it, and that record apparently lacked
the relevant documents. How then could an appeals court
say that the District Court was wrong to grant the sum-
mary judgment motion?

The panel answered this question by *not* holding that
the District Court had erred. Finding that the Sultan
documents had been "apparently negligently omitted"
from the record, it exercised its equitable powers to sup-
plement the record with the deposition. 373 F. 3d, at 691.
It also found that, since the State itself had helped to
create that document (because the State had taken Sul-
tan's deposition), the District Court's reconsideration of
the matter would not unfairly prejudice the State. And it

noted that this case is a death case. Then, relying on its
"inherent power to reconsider" an opinion "prior to the
issuance of the mandate," the court issued a new opinion,
vacating the District Court's grant of summary judgment
to the State and remanding the case to the District Court
for further proceedings on the matter. *Ibid.*

## II

The question before us is not whether we, as judges,
would have come to the same conclusions as did the panel
of the Court of Appeals. It is whether the three members
of the appellate panel abused their discretion in reconsid-
ering the matter and, after agreeing unanimously that
they would have reached a different result had they con-
sidered the overlooked evidence, vacating the District
Court's judgment and remanding the case.

The Court concludes that the panel's reconsideration of
the matter and decision to vacate the District Court's
judgment amounted to an "abuse of discretion." *Ante,* at 1.
It therefore reverses the panel's unanimous interlocutory
judgment remanding a capital case to the District Court
for an evidentiary hearing. The Court lists five reasons
why the Court of Appeals "abused its discretion." None of
these reasons, whether taken separately or considered
together, stands up to examination.

*Reason One. During the 5-month period after this Court
denied rehearing of Thompson's certiorari petition, during
which time the Court of Appeals was reconsidering the
matter, it gave "no indication that it might be revisiting its
earlier decision." Had it "notified" the parties, the court
"could have spared the parties and the state judicial system
considerable time and resources." Ante*, at 10.

If this consideration favors the Court's conclusion, it
does so to a very modest degree. For one thing, the Fed-
eral Rules themselves neither set an unchangeable dead-
line for issuance of a mandate nor require notice when the

court enlarges the time for issuance. Compare Fed. Rule App. Proc. 41(b) (2005) ("The court may shorten or extend the time"), with Rule 41(b) (1968) (mandate "shall" issue "unless the time is shortened or extended *by order*" (emphasis added)). The Advisory Committee Notes to Rule 41 expressly contemplate that the parties will themselves check the docket to determine whether the mandate has issued. See Advisory Committee's 1998 Note on subd. (c) of Rule 41 ("[T]he parties can easily calculate the anticipated date of issuance and verify issuance of the mandate[;] the entry of the order on the docket alerts the parties to that fact"). And Sixth Circuit Rules require the Circuit Clerk to provide all parties with copies of the mandate. See Internal Operating Procedure 41(a) (CA6 2005) ("Copies of the mandate are distributed to all parties and the district court clerk's office"). Thus, the State's attorneys knew, or certainly should have known, that the mandate had not issued, and, as experienced practitioners, they also knew, or certainly should have known, that a proceeding is not technically over until the court has issued its mandate. And if concerned by the delay (and some delay in such matters is not uncommon), they could have asked the Circuit Clerk why the mandate had not issued. If necessary, they could have filed a motion seeking that information or seeking the mandate's immediate issuance.

For another thing, since notification is a clerical duty, the panel may have thought the parties *had* been notified. One of the judges on the panel could well have instructed the Circuit Clerk not to issue the mandate, and then simply have assumed that the Clerk would notify the parties of that fact (though the Clerk, perhaps inadvertently, did not do so). Why would the court want to hide what it was doing from the parties? Once we apply a presumption of regularity to the panel's actions, we must assume that the failure to notify the parties was likely due

to a simple clerical error.

Further, the prejudice to the State that troubles the Court was likely small or nonexistent. The need to reset an execution date is not uncommon, and the state court's execution order explicitly foresaw that possibility. See 373 F. 3d, at 692 (Tennessee Supreme Court order set Thompson's execution date for August 19, 2004, "unless otherwise ordered by this Court or other appropriate authority" (internal quotation marks omitted)). Moreover, the State has not even argued—despite ample opportunity to do so—that the further proceedings ordered by the panel would actually have required it to set a new date.

Finally, the State did not, by way of a petition for rehearing, make any of its "failure to notify" arguments to the Court of Appeals. Although the law does not require the State to seek rehearing, such a petition would have permitted the panel to explain why the State was not notified and possibly to explore the matter of prejudice. There is no reason to reward the State for not filing a petition by assuming prejudice where none appears to exist.

Given the State's likely knowledge that the mandate had not issued, the existence of avenues for resolving any uncertainty, and the small likelihood of prejudice, the lack of notice does not significantly advance the Court's "abuse of discretion" finding. Indeed, if the Court believes that the Court of Appeals could have issued a revised opinion correcting its earlier judgment *if only it had given notice to the parties,* the sanction it now imposes—outright reversal—is far out of proportion to the crime.

*Reason Two. The court's "opportunity to consider" the Sultan evidence "at the rehearing stage is yet another factor supporting" the abuse-of-discretion "determination." Ante*, at 12. I agree that it is unfortunate that, upon review of the rehearing petition, the panel failed to make the connection that would have allowed it, at that time, to

reach the same conclusion it reached later. Still, the petition wrongly implied that the Sultan documents were part of the original appeal. Because it did not request rehearing on the ground that the documents were *not* in the record, it did not offer a genuine "opportunity to consider" the Sultan evidence.

Under these circumstances, I cannot agree that the court's opportunity to consider these documents at the rehearing stage should militate in favor of finding an abuse of discretion. To the contrary, I believe we should encourage, rather than discourage, an appellate panel, when it learns that it has made a serious mistake, to take advantage of an opportunity to correct it, rather than to ignore the problem.

*Reason Three. The "Sultan evidence . . . is not of such a character as to warrant [a] . . . departure from standard appellate procedures" because "the evidence was unlikely to have altered the District Court's resolution of Thompson's ineffective-assistance-of-counsel claim." Ante, at 14. That is to say, given the expert testimony in the trial court, the Sultan evidence is unlikely meaningfully to have strengthened Thompson's claim before the Federal District Court. Ante*, at 14–15.

This conclusion is wrong. The Court argues the following: (1) Dr. Sultan's conclusion rests in significant part upon interviews with three witnesses, Thompson's grandmother and sister (with whom Dr. Sultan spoke directly) and his girlfriend (whose interview with a defense investigator Dr. Sultan reviewed); (2) since all three of these witnesses testified at sentencing, Thompson's counsel must have consulted them at the time; and (3) "[c]onsultation with these witnesses, when combined with the opinions of [the State's expert] and [Thompson's expert], provided an adequate basis for Thompson's attorneys to conclude that focusing on Thompson's mental health was not the best strategy." *Ante*, at 16. The Court

then says that trial counsel's "strategy" may have been "a mistake," *ante*, at 17, but apparently not enough of a mistake to amount to inadequate assistance of counsel.

But how do the Court's conclusions follow from the premises? Dr. Sultan's interview of the three witnesses apparently turned up new information, indeed, crucial information. Why does that fact not tend show that trial counsel's own "consultation" with those witnesses was inadequate? Or, if trial counsel was aware of the information, why does that not tend to show that trial counsel hired an expert who was not qualified to assess Thompson's mental condition, or that counsel failed adequately to convey the critical information to that expert? This Court in *Wiggins* v. *Smith*, 539 U. S. 510, 523–525 (2003), found trial counsel inadequate for failing to conduct a reasonable investigation, given notice that such an investigation would likely turn up important mitigating evidence. See also *Rompilla* v. *Beard*, *ante*, p. \_\_\_. Why is the same not true here, where Thompson's trial counsel was fully aware of the need for a background investigation, and then either did not ask the right questions, or did not hire the right expert, or did not convey the right information to that expert? At the least, is there not a good argument to this effect—an argument that the Sultan documents significantly strengthened? All three judges on the panel thought so: They concluded that they would have reached a different result on Thompson's ineffective-assistance-of-counsel claim had they been aware of the Sultan documents. The Court does not satisfactorily explain its basis for second-guessing the panel on this point.

*Reason Four. The Sultan evidence does "not come close to satisfying the miscarriage of justice standard under Calderon." Ante,* at 17 (referring to *Calderon* v. *Thompson*, 523 U. S. 538 (1998)). As the Court apparently agrees, see *ante*, at 8–9, *Calderon* does not apply here. And the panel's basic conclusion—that consideration of

Thompson's ineffective-assistance-of-counsel claim without the benefit of the Sultan evidence would constitute a grave miscarriage of justice—survives *any* plausible standard of review. I can find nothing in the Court's opinion that explains why the panel's conclusion is wrong.

*Reason Five. The Court of Appeals "did not accord the appropriate level of respect" to the State's "judgment." Ante,* at 19. If by "judgment" the Court means to refer to the state court's original judgment of conviction, this reason simply repeats Reason Four. The panel carefully examined the entire record and determined that there is a significant likelihood the Sultan evidence would demonstrate a violation of the Federal Constitution.

If the Court means to refer to the state court's judgment not to set aside the conviction in state postconviction proceedings, the Court is clearly wrong. The state court on collateral review refused to authorize funds for a background investigation, one for which Thompson's expert then showed a strong need, and which Thompson's expert now shows could well have demonstrated a significantly mitigating mental condition. How is it disrespectful of the State for a federal habeas court to identify a constitutional error that occurred in state-court proceedings in a capital case, by taking account of a key piece of evidence, mistakenly omitted from the record?

If the Court means to refer to the State's decision to proceed with the execution, I cannot possibly agree. The Court could not mean that *any* exercise by a federal court to correct an inadvertent, and important, evidentiary error is "disrespectful" of a State's effort to proceed to execution. But if it does not mean "any" exercise at all, then how can it say the present exercise is disrespectful? The present exercise embodies as thorough an examination of the record and as significant a piece of evidence as one is likely to find. The process—the detail and care with which the Court of Appeals combed the record—does not show

"disrespect." It shows the contrary.

The upshot is that the Court's five reasons are unconvincing. The Court simply states those reasons as conclusions. It fails to show how, or why, the unanimous panel erred in reaching diametrically opposite conclusions, all supported with detailed evidence set forth in Judge Suhrheinrich's opinion. It does not satisfactorily explain the evidentiary basis for its own conclusions. And, in the process, it loses sight of the question before us: again, *not* whether we, as judges, would have reached the same conclusion that the three judges on the panel reached, but rather whether they, having unanimously agreed that their earlier decision was wrong, abused their discretion in setting it right.

## III

Ultimately this case presents three kinds of question. The first is a narrow legal question. Has the Court of Appeals abused its discretion? For the reasons I have set forth, the answer to that question, legally speaking, must be "no."

The second is an epistemological question. How, in respect to matters involving the legal impact of the Sultan report and deposition, can the Court replace the panel's judgment with its own? Judge Suhrheinrich's opinion demonstrates why any assessment of that legal impact must grow out of thorough knowledge of the record. He spent hundreds of hours with its numerous documents in order to make that assessment. Those of his conclusions that were shared by the other members of the panel are logical, rest upon record-based facts, and are nowhere refuted (in respect to those facts) by anything before us or by anything in the Court's opinion. How can the Court know that the panel is wrong?

The third question is about basic jurisprudence. A legal system is based on rules; it also seeks justice in the indi-

vidual case. Sometimes these ends conflict. To take account of such conflict, the system often grants judges a degree of discretion, thereby providing oil for the rule-based gears. When we tell the Court of Appeals that it cannot exercise its discretion to correct the serious error it discovered here, we tell courts they are not to act to cure serious injustice in similar cases. The consequence is to divorce the rule-based result from the just result. The American judicial system has long sought to avoid that divorce. Today's decision takes an unfortunate step in the wrong direction.

APPENDIX TO OPINION OF BREYER, J.

Excerpts from the Gregory Thompson Psychological Report prepared by Dr. Faye E. Sultan at the Riverbend Maximum Security Institution (RMSI) (July 22, 1999), App. 11–20.

"REFERRAL QUESTIONS:

"Mr. Gregory Thompson was referred for psychological evaluation in July, 1998 by attorney Mr. Stephen M. Kissinger of the Federal Defender Services of Eastern Tennessee Incorporated. Mr. Thompson was convicted of murder in 1985. This evaluation was requested to address the following questions:

"1. Mr. Thompson's current psychological status[.]
"2. Mr. Thompson's likely psychological status and mental state before and surrounding the time of the 1985 offense.
"3. Social, environmental, psychological, and economic factors in the life of Mr. Thompson which might have be[en] considered to be mitigating in nature at the time of his trial.

"PROCEDURE:

"Psychological evaluation of Mr. Thompson was initiated on August 20, 1998. This first evaluation session extended over a period of approximately four hours and consisted of clinical interview and the administration of the Minnesota Multiphasic Personality Inventory–2 (MMPI–2). Some review of prior psychological evaluation records was conducted to establish what formal psychological and neuropsychological testing had been administered to Mr. Thompson. Levels of current intellectual and neuropsychological functioning had been recently assessed by neuropsychologist, Barry Crown, Ph.D., so no attempt was

made to replicate this type of assessment.

"Following the 8–20–98 initial evaluation session, a very extensive review of legal, military, medical, prison and psychiatric/psychological records was initiated. A list of the documents examined is attached to this report.

.         .         .         .         .

". . . Two further interviews were conducted with Mr. Thompson for [the] limited purpose [of determining Thompson's competence to participate in habeas proceedings], on 2–2–99 and 4–7–99, totaling approximately six hours of additional observation. Voluminous Tennessee Department of Corrections mental health, medical, and administrative records were reviewed at this time as well.

.         .         .         .         .

"[T]he extensive record review conducted, the ten hours of clinical observations made of Mr. Thompson during the preceding eleven months, the interviews conducted with collateral informants, and the recent and past psychological testing which had been administered provide enough data to make it possible to render professional opinions about Mr. Thompson's mental state at and around the time of the 1985 offense.

"CLINICAL OBSERVATIONS:

"Mr. Gregory Thompson was cooperative with the assessment procedure. He answered all questions posed to him and appeared to be alert, watchful and interested in the interview process. His speech was sometimes tangential and rambling. Although motor behavior appeared controlled there was a manic quality to his verbalizations. Mr. Thompson was oriented as to person, place and time, but he repeatedly expressed his firm belief that he had written each and every song which played on the radio.

"Mr. Thompson displayed symptoms of psychosis during the two subsequent meetings. The details of these sessions will not be reviewed here.

"FORMAL PSYCHOLOGICAL TESTING:

"The Minnesota Multiphasic Personality Inventory–2 (MMPI–2) was administered to Mr. Thompson on 8–20–98. It had been determined in other examination settings that Mr. Thompson's level of reading competence exceeded the necessary level of 8th grade ability required for proper administration of this test.

"The MMPI–2 profile produced by Mr. Thompson is considered valid and appropriate for interpretation. Individuals producing similar profiles are described as experiencing significant psychological difficulties and chronic psychological maladjustment. Such individuals are considered to be highly suspicious of others, often displaying paranoid features. There is indication in this profile of the presence of a thought disorder and the inability to manage emotions. The world is perceived as a threatening and dangerous place and fears are viewed as externally generated and reality-based rather than as a product of an internally generated state. The behavior of such individuals is often described as hostile, aggressive, and rebellious against authority. Poor impulse control, lack of trust in others, and low frustration tolerance may result in such individuals displaying rage in interpersonal relationships.

"Individuals producing this testing profile are also described as experiencing depressed mood. There is the strong possibility that such individuals have contemplated suicide and report preoccupation with feeling guilty and unworthy. Testing items were endorsed which suggest memory and concentration problems, and an inability to make decisions.

"RELEVANT PSYCHOLOGICAL/PSYCHIATRIC DATA CONTAINED IN RECORDS:

"The[re] is substantial documentation throughout the Tennessee Department of Corrections records that Mr. Greg Thompson has suffered from significant mental

illness since at least the time of . . . his incarceration in 1985. He has been treated almost continuously with some combination of major tranquilizer and/or anti-depressant and/or anti-anxiety medications. He has received a variety of diagnostic labels including Psychosis, Psychosis Not Otherwise Specified, Paranoid Schizophrenia, Mania, Mixed Substance Abuse, Schizophrenia, BiPolar Affective Disorder, Schizoaffective Disorder, Malingering, and Adult Antisocial Behavior. This is clearly indicative of the Tennessee DOC mental health staff's view that Mr. Thompson has experienced major mental illness throughout at least most of his period of incarceration. Further, there is extensive documentation contained in these records of many episodes of bizarre aggressive and/or self-destructive behavior.

"INTERVIEWS WITH COLLATERAL WITNESSES:

"Five individuals were interviewed (either by telephone or face-to-face) who provided significant supplemental information about the life circumstances and past/present psychological functioning of Mr. Gregory Thompson.

"Ms. Maybelle Lamar

"Ms. Lamar is Mr. Thompson's maternal grandmother. She was interviewed by telephone on July 21, 1999. Ms. Lamar assumed total responsibility for the care and rearing of Mr. Thompson and his two older siblings after his mother was killed when Mr. Thompson was approximately five years old. Mr. Thompson remained in her home until he entered the military as a young adult.

"Ms. Lamar recalls the period following her daughter's fatal automobile accident as one of tremendous strain and disruption for her. She was unable to describe the reaction of the three young children to their mother's death because she 'took to my bed' for approximately five or six weeks following the accident. Ms. Lamar was unable to

attend to these children in any way at that time. She did not recall how they obtained food or clothing, or whether they were in any distress. Ms. Lamar reported that she was drinking alcohol quite heavily during this period and that she left her bed to resume household activities only because the children contracted a serious medical illness.

"Ms. Lamar described Mr. Thompson as displaying significantly 'different' behavior when he returned to visit her following his discharge from the U. S. Navy. 'Greg didn't act the same'. Unlike the 'eager to please', passive, sometimes funny, gentle boy who she had reared, Mr. Thompson was 'angry', 'sometimes sad'. 'I don't think he wanted me to know what was going on with him. He mostly just stayed away from me.' Ms. Lamar reported that she noticed Mr. Thompson sometimes 'staring off into space' or 'talking to himself'. She would ask him about these behaviors. 'He'd deny it. He acted like he didn't know what I was talking about.' Ms. Lamar recalls being quite concerned about her grandson's mental state during this time. She did not recall ever being asked these questions at any time before or during Mr. Thompson's trial.

"Ms. Nora Jean Hall Wharton

"Nora Jean Wharton is Mr. Thompson's older sister. A lengthy telephone interview was conducted with her on July 21, 1999. She grew up in the same home as Mr. Thompson and had continuous contact with him throughout his childhood. Mr. Thompson lived briefly in the home of his sister following his discharge from the military.

"Ms. Wharton described Mr. Greg Thompson as a highly sensitive, passive, timid, emotionally vulnerable child. She described a childhood of great hardship. According to her report, their grandmother, Ms. Maybelle Lamar[,] was verbally abusive, neglectful of the children's basic daily needs, highly critical, and unable to care properly for the children. Ms. Wharton described many instances of such

abuse and neglect. She described the period following their mother's death as particularly chaotic and neglectful, recalling that often there was no food in the home and that the children would take money from under their grandmother's mattress to go and buy food. In the period following their mother's death, Ms. Wharton reported that her grandmother was continuously drunk and unable to care for her grandchildren. According to Ms. Wharton, Greg Thompson frequently witnessed his sister Nora being beaten by their grandmother.

"Ms. Wharton further recalled that she and her younger brother had witnessed the brutal beating and rape of their mother by their biological father. She recalls Greg standing in the scene screaming and sobbing uncontrollably.

"Ms. Wharton reported that Greg would frequently cry at school during the early school years, and, as a result, was often the victim of intense mockery from his classmates. Because Ms. Wharton was in the same classroom as her brother she observed these behaviors and often intervened on her brother's behalf. She described Mr. Thompson's response to this abuse as quite passive.

"Of particular significance is Ms. Wharton's recollections about Mr. Thompson repeatedly banging his head against the wall of their home on many occasions during their early childhood. This behavior frequently followed their grandmother yelling at Greg 'You have the Devil in you.' Mr. Thompson would tell his sister that he was attempting to 'knock the Devil out' of his head in this way. Ms. Wharton recalls believing that this behavior was quite odd.

"Following his discharge from military service, Ms. Wharton described Mr. Thompson's behavior as significantly different than his prior conduct and attitude. She reported several episodes of bizarre behavior which included a sudden intense emotional reaction without obvious external provocation. Mr. Thompson would become ex-

tremely angry, would cry and scream for a len[g]thy period of time, would appear as if he might or actually become quite physically violent or aggressive, and then would suddenly retreat. Ms. Thompson reported this behavior and her concerns about it to her grandmother. Ms. Lamar suggested that Ms. Wharton take her brother to the psychiatric unit of the local hospital for treatment. Ms. Wharton did not attempt to get any treatment for Mr. Thompson and reports feeling quite guilty about this.

"Nora Jean Wharton described her own struggles with mental illness throughout the past fifteen years. She has received counseling to assist her in coping with the effects of her abusive childhood and she has been treated with a combination of a major tranquilizer (Stellazine) and antidepressant medications. She reported that her younger half-sister Kim has also suffered from significant mental illness.

"CUSTODY OFFICERS AT RMSI

"Following the second interview conducted with Mr. Thompson on 2–2–99, I informally interviewed two custody officers who escorted Mr. Thompson back to his cell. These officers have not as yet been identified by name. Both reported that they were aware that Mr. Thompson was quite mentally ill and that they were concerned about him. They further reported that they believed it would be in his best interest to be housed in a prison facility better equipped to deal with individuals experiencing severe mental illness.

"MICHAEL CHAVIS

"Federal Defender Services of Eastern Tennessee investigator, Mr. Michael Chavis, was interviewed about his July 29 through August 2, 1998 interview with Ms. Arlene Cajulao in Honolulu, Hawaii. Ms. Cajulao and Mr. Thompson had an intimate relationship and lived together

for approximately four years, from 1980 to 1984.

"Mr. Chavis reported that Ms. Cajulao described Mr. Thompson as displaying increasingly bizarre behavior during the latter part of their relationship. Similar to descriptions proved by Ms. Nora Wharton, Ms. Cajulao reported several episodes of 'paranoid' and aggressive behavior which had no apparent external antecedent. She reported that Mr. Thompson sometimes thought that people were 'after' him. He would close all the curtains in the house because he did not want the person who was 'looking' for him to see him through the curtains. She remembers being quite concerned about Mr. Thompson's mental state.

"SUMMARY AND CONCLUSIONS:

"Mr. Gregory Thompson has experienced symptoms of major mental illness throughout his adult life. Indeed, there is information available which suggests that Mr. Thompson was displaying significant signs of mental illness from the time he was a small child. Self-injurious behavior is reported as early as six years old. There is extensive documentation contained within the records reviewed for this evaluation that Mr. Thompson has experienced a thought disorder and/or an affective disorder of some type for many years.

"It is my opinion that Mr. Gregory Thompson is most appropriately diagnosed, according to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, as having Schizoaffective Disorder, Bipolar Type. As is typical of this illness, symptoms became apparent in early adulthood. Mr. Thompson was suffering serious mental illness at the time of the 1985 offense for which he has been convicted and sentenced. This mental illness would have substantially impaired Mr. Thompson's ability to conform his conduct to the requirements of the law.

"Further, Mr. Thompson was the victim of severe child-

hood emotional abuse and physical neglect. His family background is best described as highly neglectful and economically deprived. Mr. Thompson repeatedly witnessed episodes of violence during his childhood in which one family member assaulted or brutalized another. There are significant aspects of Mr. Thompson's social history that have been recognized as mitigating in other capital cases

"It is important to note that all of the information related to Mr. Thompson's early mental illness and social history was available at the time of his 1985 trial.

"[signed]
"Faye E. Sultan, Ph.D."

*          *          *

Excerpts from the Deposition of Dr. Faye E. Sultan (July 22, 1999), *Id.,* at 71–73, 76–80.

"Q. What indicates to you or what indicia are there for you that suggest Mr. Thompson was displaying significant signs of mental illness from the time he was a small child? How do you arrive at that conclusion?

"A. .          .          .          .          .

"By the time of the first grade, Mr. Thompson, when he was being yelled at by his grandmother, she was reportedly verbally abusive in the following fashion: She would yell at him you have the devil in you, boy. [His sister, Ms. Wharton] would then observe Mr. Thompson standing or sitting beside a wall repeatedly banging his head into the wall. She, in her role as protector of him, would ask him what was going on, and he would tell her he was trying to knock the devil out of his head. She recalls at the time, although she was quite young herself, being worried about his behavior and thinking of it as very odd.

.          .          .          .          .

"Q. Sort of a self-punishment or a self-exorcism type thing?

"A. A self-injurious behavior is what we would call it I think. Mr. Thompson, when he was Greg, in the first and second and third grade had rather frequent hysterical crying episodes in classrooms that Ms. Wharton recalls also as very unusual in the context of his schoolroom situation. She describes him as being the subject of torment on the part of the students because he behaved in an odd fashion. Sometimes he would simply begin to cry and wail and scream and apparently made a sound like a fire engine when he was sobbing and developed the nickname Fire Engine. That's reported in the trial transcript. She told me much more detail about actually the extent of those kind[s] of emotional outbursts.

"At home it was rather common for Mr. Thompson to begin to cry and scream during times when Ms. Wharton herself was being beaten by their grandmother. Ms. Wharton was the victim of physical abuse on the part of the grandmother. Mr. Thompson observed much of this since they were together virtually all of the time, and Nora Wharton was not really permitted much interaction outside of their home.

.          .          .          .          .

"Q. Your diagnosis for Mr. Thompson is schizoaffective disorder, comma, bipolar type. What leads you to that diagnosis from what you've reviewed and your testing results?

"A. What leads me to the diagnosis is that there is a long history, perhaps at this point almost a 20-year history, of simultaneous thought disorder on the part of Mr. Thompson documented throughout all the records, and affective disorder, emotional disorder, being unable to regulate his emotions, sometimes falling into the pits of despair and becoming suicidal, sometimes becoming

highly agitated and manic and having too much energy, too much exuberance, and grandiose thinking. The thought disorder is manifested in persecutory ideas, delusions of grandeur—lots of different kinds of delusions actually—auditory hallucinations that he sometimes admits to, sometimes suspected by the doctors who are doing the examination.

"The psychological testing early on in Mr. Thompson's incarceration confirm[s] the presence of a psychotic process. There was an MMPI administered to him by a prison psychologist in 1990 that is described as valid and indicative of psychotic process, and throughout the prison record he receives a variety of diagnoses that take into account both thought disorder and affective illness.

"The very best diagnosis to describe all of the complex of symptoms that I just talked to you about is schizoaffective disorder, bipolar type.

"Q. You note in your report Mr. Thompson was observed having a significant change in behavior after he was discharged from the Navy. What significance do you attach to that fact?

"A. Well. . . [p]rior to his entry into the military Mr. Thompson is described almost uniformly . . . as passive, as compliant, as eager to please, as gentle, as timid, as eager to run from attacks.

"At some point . . . he began to notice that people were trying to hurt him all the time, that officers and other people of his rank and slightly above his rank attempted to provoke him, that they sometimes physically assaulted him, that he thought he was being followed a lot, and that he sometimes struck out in what he thought was defense and then later found out from other people who he knew and trusted that there wasn't anything to defend against or that there might not have been anything to defend against.

"Q. This is what he related to you during your interview

last August?

"A. Right. The people who saw him after the military each were struck by how very different he seemed. That was the word that kept being used, 'different.' Sometimes the people I was speaking to were not able to describe what different meant, but, for example, the grandmother said that he was different as in not right, that he wasn't himself. Ms. Wharton tells me that the grandmother was very well aware that he was in deep psychological distress, and, in fact, the grandmother suggested that he be taken to the psychiatric unit at Grady Hospital in Atlanta, I believe, for treatment. The grandmother observed him staring off into space for long periods of time. She observed him mumbling to himself. When she asked him what he was doing, he told her he had no idea what she was talking about. She said that was very different from the boy who left her to go into service.

"The sister has even a better glimpse of him than that, because he actually went to live with her for a while, and she said he was bizarre. She described him as paranoid. She said that he would explode for no reason at all, that she was afraid of him for the very first time in her life, that they had always been terribly close, the sort of close where if there was only one piece of bread to eat they would share it, that they always looked out for one another, and that suddenly he was behaving in ways that she simply could not identify. She described three very serious episodes of aggression and emotional upset that she said are what led her to approach her grandmother about what to do for treatment for him.

.     .     .     .     .

"Q. You state that the schizoaffective disorder, bipolar type, would substantially impair Mr. Thompson's ability to conform his conduct to the requirements of the law. How so?

"A. There are points in time when Mr. Thompson is out

of contact with reality. He is responding to situations that simply don't exist or that he perceives in extremely exaggerated or different form. A person is not able to conform one's conduct to the law if you are frankly delusional or hallucinating in some way. Mr. Thompson over the years has had both of those symptoms.

"Q. So it's this delusional aspect of this disorder that is the main factor that would keep him from having the ability to conform his conduct to the requirements of law, if I understand you correctly?

"A. Is it the main factor? Let me say that I think it's at least as potent a factor if not more as the other aspect of his mental illness, which is that he has emotional disregulation.

"Q. Meaning?

"A. Meaning Mr. Thompson often is not in control of his emotions. He has episodes of rage, of aggression, that he doesn't understand or relate to very well. He's told about them later. Sometimes he remembers them, sometimes he doesn't. He is often embarrassed about his behavior afterwards, but there are points at which I believe he's not in control of what he's doing.

"Q. When you say 'he's not in control of what he's doing,' are you saying that it's impulsive behavior?

"A. If I am emotionally disregulated, if I'm over-aroused and overreactive and I operate out of a faulty belief system, so that not only do I have the impulse to do things that I ordinarily wouldn't, but I also think things are going on that aren't, I have a combination in which yes, I suppose you could call it impulse, but you also have to take the notion into account that it might be an impulse to do something that doesn't make any sense.

"Q. Does this disorder prevent Mr. Thompson from planning his activities?

"A. Sometimes, yes, it does.

"Q. And so the inability to plan, would that be a factor

that would prevent him from conforming his conduct to the requirements of the law?

"A. If that were in operation at some time. In the history of the Department of Corrections' mental health records, when he's properly medicated I don't think that's true about him.

"Q. Is it your professional opinion, then, that when he is medicated he has the ability to plan, but when he is not medicated he does not always have the ability to plan?

"A. Those two things are true. It's also true that if he's inadequately medicated or improperly medicated he doesn't have the ability to plan anything. I don't know whether he has impulses. I think he's all impulse, so to have impulses implies that there's a part of you that's not impulsive. For example, when Mr. Chavis and I saw him during my second interview with him, he could not have planned anything at all, not beyond the nanosecond in which he was experiencing the world. But he was receiving psychotropic medications at the time, so that's why I have to put that qualifier in there."